# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **TIARA NANCE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Civil Action No. 5:19-cv-00351-CLS** |
| | ) |
| **HEALTH CARE AUTHORITY OF** | ) |
| **THE CITY OF HUNTSVILLE d/b/a** | ) |
| **HUNTSVILLE HOSPITAL HEALTH** | ) |
| **SYSTEM,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Plaintiff, Tiara Nance, asserts claims against her former employer, the Health

Care Authority of the City of Huntsville, Alabama, doing business as the Huntsville

Hospital Health Care System ("the Hospital"),[1] for disability discrimination and

retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et*

*seq.*, as amended ("the ADA"), as well as claims for interference and retaliation under

the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA").  The

case currently is before the court on defendant's motion for summary judgment.[2]

---

[1] Counsel for the parties discuss a claim for retaliation under the ADA:  *see* doc. no. 24 (Defendant's Brief in Support of Summary Judgment), at 25-29; doc. no. 29 (Plaintiff's Brief in Opposition to Summary Judgment), at 17-18.  However, plaintiff's attorney failed to plead such a claim as a separate Count of her complaint.  This issue is discussed in Part III.B, *infra*.

[2] *See* doc. no. 23 (Defendant's Motion for Summary Judgment).

Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes that the motion should be granted.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Supreme Court added a gloss to the language of that Rule, saying that summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  FACTS

Sometime before 2009, plaintiff, Tiara Nance ("Nance"), was diagnosed with Crohn's disease:  a gastrointestinal disorder that is similar to ulcerative colitis,[3] and one which, in Nance's case, caused periodic flare-ups consisting of vomiting, diarrhea, fatigue, and pain in her abdomen and joints.[4]

Nance's first stint of employment with Huntsville Hospital began on some

---

[3] *See* doc. no. 25-1 (Plaintiff's Deposition), at 26-27 (speculating that she was diagnosed with Crohn's disease "[m]aybe before" 2009) (alteration supplied).  Crohn's disease and ulcerative colitis present almost identical symptoms.  *See* Jenna Fletcher & Elaine K. Luo, M.D., *What Is the Difference Between Crohn's Disease and Ulcerative Colitis?*, Medical News Today (June 6, 2017), https://www.medicalnewstoday.com/articles/317792 (last visited May 8, 2020).  *See* doc. no. 29-8 (FMLA Medical Leave Certificate), at 5 (noting a diagnosis of ulcerative colitis in 2010).

[4] *See* doc. no. 25-1 (Plaintiff's Deposition), at 59-60; doc. no. 29-1 (Notes from Nance's Oct. 26, 2017 visit to Dr. John Kaliszak), at 3 (noting abdominal pain, joint pain, and myalgia in the hip girdle and shoulders).

unspecified date prior to the end of June 2009.  She was hired to work as a radiology

tech assistant for twelve hours on Saturdays and Sundays.[5]  She did not consistently

comply with even those part-time work requirements, however, as demonstrated by

the written warning issued on July 26, 2009, stating that Nance had accumulated six

unscheduled absences and warning that she would be terminated if she accrued three

more.[6]  Nance did not apply for FMLA leave during that initial period of employment,

because she had not been employed by the Hospital for a sufficient period to qualify

for coverage under the Act.[7]

Nance voluntarily resigned her part-time position on or about October 19,

2009, citing the difficulties of balancing the responsibilities of school, employment,

and child care.[8]  Notably, she did not say that health issues played any part in either

---

[5] *See* doc. no. 25-1 (Plaintiff's Deposition), at 24-25.  Nance's duties consisted of transporting patients to-and-from the radiology labs.  *Id.* at 25.

[6] *See id.* at 25-26; doc. no. 25-2 (July 26, 2009 "Final Warning" stating, *inter alia*, that "Further instances of unscheduled absences or late arrival to work or from break may result in termination"; and that, "**If she reaches 9 absences she will be terminated**." (emphasis in original)).

[7] *See* doc. no. 25-1 (Plaintiff's Deposition), at 27-28.  The Family and Medical Leave Act defines an "eligible employee" as "an employee who has been employed — (*i*) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (*ii*) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A).

[8] Nance gave two weeks notice of her intent to resign in the following, October 5, 2009 email to Kim Lamb, Clinical Operations Manager of the Hospital's Imaging Services:

I thank you so much.  I am writing to let you [know] I am putting in my two weeks notice.  I will know [*sic*] longer be employed in your department after two weeks. I have had a great time working with my fellow co-workers and realize that [*sic*] are very nice, hard-working, and dedicated people.  *I have had to take on a lot of*

4

her failure to comply with her work schedule, or her decision to resign.[9]

Nearly six years later, in September 2015, Huntsville Hospital offered to re-employ Nance as a full-time scheduler in the Pain Management Department.[10]  After accepting the offer, Nance completed an "Employee Health Screen" which disclosed that she had a history of anxiety and colitis,[11] "a chronic digestive disease characterized by inflammation of the inner lining of the colon. . . .  There are many different forms of colitis, including Ulcerative colitis and Crohn's disease."[12] Nance's responses to other questions on the Hospital's Employee Health Screen

---

*different matters this past semester with school, work, and my son, and also being part of the Social Work Club and it has become stressful at this point*.  I really do appreciate what you have done for me as a Manager and really do thank you for being there for me when I need you.  I really do hate that I have to leave yall [*sic*] but it's just for the best of my interest right now.  I hope to see you around and have a good year.

Doc. no. 25-3 (emphasis supplied).  *See also* doc. no. 25-1 (Plaintiff's Deposition), at 28-32.

[9] *See* doc. no. 25-1 (Plaintiff's Deposition), at 34 (where Nance is questioned about why she did not mention medical or health issues as a reason for resigning her position in the email quoted in the preceding note, and she responded:  "I didn't feel like it was that much of an issue.").

[10] *See id.* at 46-48, 54-55.

[11] *See* doc. no. 25-4 (Sept. 21, 2015 Employee Health Screen Form), at 3 (attributing anxiety to the fact that her brother had been murdered two years ago, and stating with respect to Colitis "Azathioprine."  That handwritten reference is intriguing, because "Azathioprine" is a drug that is used to prevent a person's body from rejecting a transplanted kidney, and to treat symptoms of rheumatoid arthritis, but it also "may cause a rare type of lymphoma (cancer) of the liver, spleen, and bone marrow that can be fatal.  This has occurred mainly in teenagers and young men with *Crohn's disease or ulcerative colitis*."  *Azathioprine*, Drugs.com, https://www.drugs.goc/mtm/azathioprine.html (emphasis supplied) (last visited May 16, 2020).

[12] *Colitis*, The George Washington U. Hosp., https://www.gwhospital.com/conditions-services/digestive-disorder-center/colitis (last visited May 16, 2020).  See also the publication cited in note 3, *supra*.

confirmed that she did not require physical accommodations, and that no restrictions

upon her activities had been prescribed by a physician.[13]

Nance also executed a form affirming her understanding that employment by

the Hospital required her to conform to fifteen "Standards of Behavior," including

these:

> **Attitude**
> We are committed to improving health care through a positive approach
> to meeting our customers' needs.   Our customers include patients,
> families, physicians, co-workers, and any other people with whom we
> interact during our time at work.
>
> . . . .
>
> **Communication**
> Communication is a vital aspect of our interaction with all customers.
> We must be committed to listening attentively to our customers in order
> to provide the excellent care and service that is expected.   We will
> reflect patience, understanding, honesty, and respect in both verbal and
> non-verbal communications.

Doc. no. 25-5 (Standards of Behavior Acknowledgment), at 2.[14]

Approximately two months after beginning her second stint of employment

with the Hospital, Nance transferred to a "PRN Scheduler" position, which essentially

meant that she became an employee who "floated," and filled-in at different positions

---

[13] *See* doc. no. 25-4 (Sept. 21, 2015 Employee Health Screen Form), at 2; *see also* doc. no.
25-1 (Plaintiff's Deposition), at 46-47, 49.

[14] *See also* doc. no. 25-1 (Plaintiff's Deposition), at 51-52.   Nance also acknowledged that
she reviewed the Hospital's "Employee Handbook" during orientation. *See id.* at 49-50; doc. no. 25-
6 (Verification of Attendance at Hospital Orientation).

on an "as-needed" basis.[15]  While working in that capacity, she received accolades

from a supervisor and patient.[16]  Less than four months after assuming the PRN

Scheduler position, however, Nance transferred back to a full-time Scheduler position

in (she thinks "it could have been") the Medical Records Department.[17]

Nance received her first performance appraisal as a "Provisional Employee"

on July 5, 2016.  As shown in the following table, she was graded on fifteen

"Standards of Behavior" with a three-point scale on which:  "1" indicated that her

behavior did "Not Meet[] Expectations"; "2" signified that her performance "Meets

Expectations"; and "3" meant that her behavior "Exceed[ed] Expectations."[18]

| | | Provisional Employee |
| Standards of Behavior | Annual Evaluation | Progressing as Expected? |
| --- | --- | --- |

---

[15] *See* doc. no. 25-1 (Plaintiff's Deposition), at 55-57 (Nance remembers the days and hours of work as remaining the same, but her pay was increased 20.9%, from $11.00 to $12.30 an hour).

[16] *See* doc. no. 29-4 (Plaintiff's Exhibit 4), at 2 (Feb. 26, 2016 note from supervisor Susan Manning thanking Nance for "Offering Excellent Customer Service"); and *id.* at 3 (Feb. 24, 2016 note from (apparently) a patient named Barbara Calloway, to Supervisor Manning), reading:

> I would like to give accolades to Tiara Nance on behalf of all the patients that she helps in the time of their needs.  She is very nice, friendly, and empathetic toward all the people she accommodates in her job.  The Tennessee Valley Pain Consultants are very fortunate to have her.

[17] *See* doc. no. 25-1 (Plaintiff's Deposition), at 57-58.

[18] Doc. no. 25-7 (July 5, 2016 Performance Appraisal), at 3 (alteration supplied).  Even though the numerical scores were recorded in a column labeled "Annual Evaluation," Nance had not then been re-employed by the Hospital for a full year.  Even more confusing are these facts:  the form stated at the top of the initial page that the "Information on this page is as of 05/16/2016," and that the appraisal was to be returned to "HR by July 8, 2016," but the "Effective Date" typed at the bottom of that same page was "August 14, 2016."  *Id.* at 2.

| | | |
|---|---|---|
| ATTITUDE (Treats everyone with respect, good listener, attentive, apologetic for problems or inconvenience) | 1.75 | ☐ Yes ☐ No |
| AVAILABILITY (attendance, promptness, availability for relief and holiday shifts, willingness to come in when called) | 1.75 | ☐ Yes ☐ No |
| APPEARANCE (neatness and professional attire appropriate for position, personal hygiene is a priority) | 2.00 | ☐ Yes ☐ No |
| INITIATIVE (consistently prepared, able to recognize a task anmd perform it, contributes ideas) | 1.75 | ☐ Yes ☐ No |
| FOLLOW THROUGH (completes job tasks assigned within defined timeline) | 1.75 | ☐ Yes ☐ No |
| JUDGMENT (considers options, able to recognize problems and solve them, makes sound and informed decisions) | 1.75 | ☐ Yes ☐ No |
| INFLUENCE (communicates objectives, motivates others, promotes teamwork and maintains morale.  Takes an active rule in staff meetings) | 1.50 | ☐ Yes ☐ No |
| HOSPITAL POLICIES (knows, understands, and follows the policies of the hospital and department) | 2.00 | ☐ Yes ☐ No |
| CLEANLINESS (keeps up with daily cleaning, cleans up after him/herself, takes personal responsibility for department's appearance) | 2.00 | ☐ Yes ☐ No |
| COMMUNICATION (approachable, responsive and easy to understand.  Clarifies requests and responds clearly and in a timely manner) | 2.00 | ☐ Yes ☐ No |
| INTRA-STAFF RELATIONS (promotes a cooperative working environment. Understands the value of teamwork and shows an enthusiasm and willingness to help others and the hospital function as a unit.  Encourages and assists new staff members) | 1.50 | ☐ Yes ☐ No |
| CUSTOMER/EXTERNAL RELATIONS (promotes collaborative customer relations, anticipates customer needs and offers assistance before required or asked for) | 2.00 | ☐ Yes ☐ No |
| PROFESSIONAL GROWTH (attends local, state, and/or national CE meetings, keeps up to date on current procedures and licensures/certifications, and completes mandatory requirements within defined timeframe) | 2.00 | ☐ Yes ☐ No |
| PRIVACY (ensures patient/co-worker/employee confidentiality, follows HIPAA guidelines – if patient care: protects patient dignity, communicates with patient and/or family in private) | 2.00 | ☐ Yes ☐ No |
| SAFETY (takes personal responsibility to ensure a safe working environment) | 2.00 | ☐ Yes ☐ No |
| **Average *Standards of Behavior* Score (Total Score / 15)** | *1.85* | |

Doc. no. 25-7 (July 5, 2016 Performance Appraisal), at 3.

As shown in the foregoing table, Nance's two lowest scores (both 1.50) were in the behavioral categories of "influence" and "intra-staff relations."  She received five additional scores below 2.0 (each 1.75) in the behavioral categories of "attitude,"

8

"availability," "initiative," "follow through," and "judgment." Her eight remaining scores were 2.0, meaning that her conduct in those behavioral categories merely met expectations. Her average score of 1.85 indicated that, overall, her Standards of Behavior did not meet expectations. The manager who completed the July 5, 2016 appraisal graded Nance's performance of "essential job functions" as 1.95, which resulted in a "Final Evaluation Score" of 1.90:[19] still *below* "Meets Expectations." Nevertheless, the grading manager commented that Nance had "done well in her position as Physician Office representative/check out," and noted that she had been "cross trained to work check in and registration." Nevertheless, she forewarned Nance to "be mindful of her interactions with coworkers and steer clear of office gossip."[20]

Six months later, Nance transferred, "effective January 15, 2017," to a part-time position in the Hospital's Reference Lab.[21] She testified that she needed to work fewer hours due to "flare-ups" of her Crohn's disease, which produced bouts of vomiting, diarrhea, and fatigue.[22]

---

[19] The sum of the 1.85 "Standards of Behavior Average" score plus the 1.90 "Essential Job Functions" score (3.80) divided by 2 = 1.90.

[20] *Id.* at 3.

[21] *See* doc. no. 25-1 (Plaintiff's Deposition), at 58 (Nance confirms a Hospital document recording her "transfer from Pain Management to Ref Lab, effective January 15, 2017").

[22] *Id*. at 58-59. She was treated at that time by Dr. Rodney Morris, her general care physician, as opposed to a specialist. *Id*. at 60-61.

Nance received her second performance appraisal from her Reference Lab supervisor on June 23, 2017.[23] Unlike the previous July 5, 2016 appraisal, Nance was not assigned numerical grades in the fifteen "Standards of Behavior" categories because she still was in her "provisional period" of employment within the Reference Lab when the review took place. (The Hospital's Employee Relations Specialist, Cynthia Traylor, testified that: "When a hospital employee starts a new position, they are placed in a one (1) to six (6) month provisional period, depending on performance issues, so that managers can determine if the employee is fulfilling the expectations of the position and is a good fit."[24]) Thus, her Reference Lab supervisor simply noted by check-marks placed in boxes labeled "Yes" or "No" whether, as a "Provisional Employee," Nance was "Progressing as Expected."

| Standards of Behavior | Annual Evaluation | Provisional Employee Progressing as Expected? |
|---|---|---|
| ATTITUDE (Treats everyone with respect, good listener, attentive, apologetic for problems or inconvenience) | | ✓ Yes ☐ No |
| AVAILABILITY (attendance, promptness, availability for relief and holiday shifts, willingness to come in when called) | | ✓ Yes ☐ No |
| APPEARANCE (neatness and professional attire appropriate for position, personal hygiene is a priority) | | ✓ Yes ☐ No |
| INITIATIVE (consistently prepared, able to recognize a task anmd perform it, contributes ideas) | | ✓ Yes ☐ No |
| FOLLOW THROUGH (completes job tasks assigned within defined timeline) | | ✓ Yes ☐ No |

---

[23] *See* doc. no. 25-8 (June 23, 2017 Performance Appraisal), at 4; *see also id*. at 2 (stating that the "Information on this page is as of 04/10, 2017," the appraisal was to be returned "to HR by July 7, 2017," and that the "Effective Date" was "August 13, 2017").

[24] Doc. no. 25-13 (Cynthia Traylor Affidavit), ¶ 7.

10

| | | |
|---|---|---|
| JUDGMENT (considers options, able to recognize problems and solve them, makes sound and informed decisions) | | ☐ Yes ✓ No |
| INFLUENCE (communicates objectives, motivates others, promotes teamwork and maintains morale.  Takes an active rule in staff meetings) | | ✓ Yes ☐ No |
| HOSPITAL POLICIES (knows, understands, and follows the policies of the hospital and department) | | ✓ Yes ☐ No |
| CLEANLINESS (keeps up with daily cleaning, cleans up after him/herself, takes personal responsibility for department's appearance) | | ✓ Yes ☐ No |
| COMMUNICATION (approachable, responsive and easy to understand.  Clarifies requests and responds clearly and in a timely manner) | | ☐ Yes ✓ No |
| INTRA-STAFF RELATIONS (promotes a cooperative working environment.  Understands the value of teamwork and shows an enthusiasm and willingness to help others and the hospital function as a unit.  Encourages and assists new staff members) | | ✓ Yes ☐ No |
| CUSTOMER/EXTERNAL RELATIONS (promotes collaborative customer relations, anticipates customer needs and offers assistance before required or asked for) | | ✓ Yes ☐ No |
| PROFESSIONAL GROWTH (attends local, state, and/or national CE meetings, keeps up to date on current procedures and licensures/certifications, and completes mandatory requirements within defined timeframe) | | ✓ Yes ☐ No |
| PRIVACY (ensures patient/co-worker/employee confidentiality, follows HIPAA guidelines – if patient care: protects patient dignity, communicates with patient and/or family in private) | | ✓ Yes ☐ No |
| SAFETY (takes personal responsibility to ensure a safe working environment) | | ✓ Yes ☐ No |
| **Average *Standards of Behavior* Score (Total Score / 15)** | *0.00* | |

Doc. no. 25-8 (June 23, 2017 Performance Appraisal), at 3.

Nance's Reference Lab manager checked "No" on only two of the fifteen behavioral categories ("judgment" and "communication"), and her comments on Nance's performance of "Essential Job Functions" were a mixed bag of some positive statements, along with warnings that a wise reader should have heeded:

> Tiara is a very confident person and she does her job at an acceptable level. *However, her attitude can sometimes come across as bossy or too aggressive for her co-workers*.  Tiara has gained compliments for her assistance to patients.
>
> . . . .

11

**Accomplishments this year have been**:
Tiara is willing to learn and always promotes customer service to patients.

**Employee's greatest strength**:
Tiara's friendly personality can be useful in her customer service role as the front desk person.

**Areas in which you would like to see improvement over the next year**:
Tiara is very sociable. *She should become a little less talkative to avoid distraction to her co-workers. Tiara should always remain professional while talking to patients/co-workers on the phone.*

*Id.* (emphasis supplied).[25]  Overall, the Reference Lab manager indicated by checks in boxes labeled "Yes" that Nance had "successfully completed [her] provisional period"; that she was "rated [as] 'progressing on track'"; and, that her "Provisional period ends."[26]

Thus, despite her illness, Nance was able to perform her Reference Lab job duties sufficiently well to successfully complete her provisional period.[27]  Indeed, before Nance became eligible for FMLA leave, she worked through approximately

---

[25] Despite the emphasized warnings, Nance did not receive counseling from her Reference Lab manager.  *See* doc. no. 25-1 (Plaintiff's Deposition), at 71.

[26] Doc. no. 25-8 (June 23, 2017 Performance Appraisal), at 4 (alteration supplied).

[27] *Compare* doc. no. 25-1 (Plaintiff's Deposition), at 72-73 (testifying that Crohn's disease never caused Nance any problems with performing her job duties while working in the Reference Lab) *with* doc. no. 25-8 (June 23, 2017 Performance Appraisal), at 4 (stating that "Employee has successfully completed their provisional period," and that "Employee rated 'progressing on track'. Provisional period ends").

12

six flare-ups of her Crohn's disease, and still performed her job duties.[28]

Nance's Reference Lab supervisor notified her on September 20, 2017 that, due to patient volume, she needed to transfer Nance to a second-shift position in Central Processing.[29] Childcare responsibilities prevented Nance from accepting the transfer, however, and she therefore sought another first-shift position in registration.[30]

Mutual of Omaha Insurance Company, the third-party administrator of the Hospital's FMLA policies,[31] mailed a letter to Nance on September 29, 2017, stating that her application for intermittent FMLA leave had been approved.[32]   That entitled her to be absent from work once each month for one treatment or medical appointment "lasting up to 1 day(s) per treatment/appointment," and also to as many as "18 episodic incapacitation(s) per year lasting up to 3 day(s) per episode."[33]   Nance believed that those accommodations were adequate to cover any absences that might be caused by her medical conditions.[34]

Nance estimates that, on the date she submitted her application for intermittent

---

[28] *See* doc. no. 25-1 (Plaintiff's Deposition), at 96-99.

[29] *See id.* at 73-75.

[30] *Id.*; *see also* doc. no. 25-9 (Sept. 20, 2017 Statement signed by Amy Puryear, Monique Thatch, and Rhonda Atkins).

[31] *See* doc. no. 25-1 (Plaintiff's Deposition), at 199.

[32] *See* doc. no. 25-10 (Mutual of Omaha Letter Approving FMLA Leave); *see also* doc. no. 25-1 (Plaintiff's Deposition), at 75-77.

[33] *See* doc. no. 25-10, at 2 (Mutual of Omaha Letter Approving FMLA Leave).

[34] *See* doc. no. 25-1 (Plaintiff's Deposition), at 77.

FMLA leave, she had been experiencing flare-ups every two or three months, and that each episode lasted two to three days.[35]  Her symptoms generally consisted of nausea, vomiting, fatigue, stress, and depression from not being able to eat.[36]  Treatment included rest and, occasionally, receiving an intravenous infusion to restore fluids to her dehydrated body ("rehydration").[37]  Nance was homebound during her flare-ups, and required assistance to run errands and care for her children.[38]  She was able to bathe, but even that activity was tiring.  The physician who certified her FMLA-leave application stated that she was "not able to perform any job duties during a flare-up."[39]

Nance submitted an application to transfer to a position in the Hospital's Registration Unit on or about October 5, 2017, and was selected to fill it.[40]  Her application stated that her preference was to work thirty-two or more hours ("**32+**

---

[35] *See id.* at 81-82.

[36] *See id.* at 82.

[37] *See id.* at 82-83.

[38] *See id.* at 83-84.  Nance testified that she attempted to rest through the pain, but her stomach generally was in "[k]nots like it's firing." *Id.* at 84 (alteration supplied).

[39] Doc. no. 29-8 (Sept. 27, 2017 FMLA Medical Leave Certificate from Dr. Anthony Ughouke), at 5.  *But see* doc. no. 25-1 (Plaintiff's Deposition), at 129 (record from Dr. Kaliszak's office stating that Nance "presenting with abdominal pain.  It's described as intermittent and sharp. The symptom is ongoing.  The symptoms started in adulthood but *complaint does not limit activities*. . . .").

[40] *See* doc. no. 25-11 (Oct. 2017 Registration Rep II Application); *see also* doc. no. 25-1 (Plaintiff's Deposition), at 89-90.

up") each week on the day shift,[41] but the position awarded was full-time, requiring Nance to work forty hours a week.  Nance testified that it had not been explained to her during the interview that she would be expected to work a full, forty-hour week.[42] Consequently, approximately two weeks after being offered the position, Nance requested yet another transfer, saying that her Crohn's disease made it "too much on [her] body" to work more than part-time.[43]

Nance then applied for transfer to a part-time position as a "registration representative" in the Main Admitting unit in the Hospital's Medical Tower on Governor's Drive.[44]  The Registration Unit Manager, Heidi Brown,[45] interviewed Nance and awarded the position to her.[46]  Brown did so, despite being told by Nance during her initial interview that she suffered from Crohn's disease.[47]  It should be noted, however, that Nance did not tell Brown that she then was on FMLA leave, and

---

[41] *See* doc. no. 25-11 (Oct. 2017 Registration Rep II Application)*, at* 3, ¶¶ 9 & 10; *see also* doc. no. 25-1 (Plaintiff's Deposition), at 99-100.

[42] *See* doc. no. 25-1 (Plaintiff's Deposition), at 90-91; *see also* doc. no. 25-12 (Nance Fact Sheet compiled by Rachel Tew, Entries for Oct. 5, 6, & 25 2017).

[43] *See* doc. no. 25-1 (Plaintiff's Deposition), at 92-95 (alteration supplied).

[44] *Id.* at 101-02.

[45] *See* doc. no. 25-14 (Heidi Brown Affidavit), ¶ 2.

[46] *See* doc. no. 25-1 (Plaintiff's Deposition), at 102, 104-05.

[47] *See* doc. no. 25-14 (Heidi Brown Affidavit), ¶ 4 ("I knew that Nance had Crohn's disease when I hired her because she volunteered that information in her job interview.").  Nance testified during deposition that she also told Ms. Brown during her job interview that she might need time off for intravenous infusions, and the expected dates of such procedures.  *See* doc. no. 25-1 (Plaintiff's Deposition), at 103-05.

15

Nance acknowledged that Hospital managers, like Ms. Brown, likely did not have access to her FMLA records that were maintained by the third-party administrator, Mutual of Omaha Insurance Company.[48]

Heidi Brown's Affidavit explained the duties and work schedule of the position awarded to Nance as follows:

> 5.    As a registration representative, Nance was expected to provide excellent customer service to patients; work with other registration representatives; escort families who arrive at the hospital to the proper location; answer phone calls; check-in patients; and inform clinical staff that patients have arrived.
>
> 6.    Nance worked approximately 26 hours per week, with Wednesdays off.  If she worked more than 6 hours [in a day], Nance was required to take a lunch break.  Nance was allowed 30 minutes for lunch.  If she was unable to take a lunch because of work duties, Nance was required to notify her supervisor so that she could receive compensation.
>
> 7.    On a few limited occasions, Kristi Calvert, the unit coordinator, or I asked Nance if she could fill in for other employees. Her agreement to do so was completely voluntary and Nance was never threatened with any discipline if she was not able to work additional hours.  Nance never told me that she had any restrictions from any physician limiting the number of hours per week that she could work.

Doc. no. 25-14 (Heidi Brown Affidavit), ¶¶ 5-7 (alterations supplied).

Marilyn Pruitt trained Nance on the duties of her new position in registration,

---

[48] *See* doc. no. 25-1 (Plaintiff's Deposition), at 201-03; *see also* doc. no. 25-14 (Heidi Brown Affidavit), ¶ 20 ("I am not involved in approving or granting FMLA leave for employees.  I had no knowledge as to whether Nance was using FMLA leave.").

and afterwards told Kristi Calvert, the Main Admitting Unit Coordinator,[49] that Nance "came across" as "agitated and impatient when dealing with patients."[50]  Another Hospital employee, Kim Carroll, complained to Calvert that Nance "was negative," and always was "trying to start drama."[51]  As a result of such criticisms, Calvert counseled Nance "about being nice and getting along with other employees."[52]  She also relayed the criticisms to Heidi Brown.[53]

In December of 2017, Heidi Brown and Kristi Calvert witnessed Nance texting on her cell telephone while she was working at the front desk.[54]  Brown counseled Nance, "and reminded her of Huntsville Hospital's cell phone policy which states that representatives may use cell phones only in break rooms during break time."[55]

Nance sent the following text message to Kristi Calvert on Monday, December 4, 2017, informing her that she was experiencing a flare up of her Crohn's disease, and likely would not be able to work the following day:  "Hey lady I'm still not

---

[49] *See* doc. no. 25-15 (Kristi Calvert Affidavit), ¶ 2.

[50] *Id.* ¶ 5.

[51] *Id.* ¶ 6.

[52] *Id.*

[53] *See id.* ¶ 7.

[54] *See id.* ¶ 8; doc. no. 25-14 (Heidi Brown Affidavit), ¶ 8.  Nance contends, however, that she was not behind the desk during the referenced incident, but instead was packed up and waiting to clock out.  Doc. no. 25-1 (Plaintiff's Deposition), at 142-43.  Nance also contends that she regularly observed other employees using their cell telephones at the front desk, but admits she never reported any such misconduct to Heidi Brown or any other supervisor.  *Id.* at 143-44.

[55] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 8.

feeling to [*sic*] well, so wanted to let you know I may not be at work tomorrow, sorry [i]t sucks having [Crohn's]."[56]  Calvert's response requested merely that Nance "let [her] know for sure at least two hours before" she was scheduled to report to work, and added:  "Feel better."[57]

Brown learned on Thursday, December 14, 2017, of a critical review of the Hospital's Outpatient Surgery Unit that had been posted on "Google,®" and which stated that a registration employee had been "rude and unhelpful."[58]  Brown questioned Nance and Brianna Cave, another Registration Unit employee, asking whether either recalled the incident described.  Both denied any knowledge of it.[59]

Nance had been scheduled to relieve Cave shortly after she was questioned by Brown, but she failed to do so.  "Cave reported that Nance was gone for over an hour and could not be located."[60]  When Brown confronted Nance about her extended absence, Nance said she had become "sick to her stomach" when questioned about

---

[56] *See* doc. no. 29-7 (Text Messages Between Nance and Calvert), at 2 (alterations supplied). *See also* doc. no. 25-1 (Plaintiff's Deposition), at 123-24.

[57] Doc. no. 29-7 (Text Messages Between Nance and Calvert), at 2-3 (alterations supplied); *see also* doc. no. 25-1 (Plaintiff's Deposition), at 123-24.

[58] *See* doc. no. 25-14 (Heidi Brown Affidavit), ¶ 10; *see also* doc. no. 25-16 (Email Containing Google Review), at 5.

[59] *See* doc. no. 25-1 (Plaintiff's Deposition), at 139-42.

[60] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 10.  Nance agreed during her deposition that she was gone "for a long period of time," but contends that she told her co-worker she was "going to the bathroom." *See* doc. no. 25-1 (Plaintiff's Deposition), at 144-45.  After going to the bathroom, however, Nance states that she relieved another employee (but not Cave) in MRI registration.  *Id*. She offered no explanation or justification for that.

18

the negative Google review,[61] and that she was "uncomfortable around" Brown, not just because Brown was "her boss" and she was "scared" of her, *but also* "*because* [Brown] *had a resting bitch face*."[62]   Brown "was shocked by Nance's highly inappropriate comment,"[63] but did not discipline her.

At 5:36 p.m. on Monday of the following week, December 18, 2017, Nance sent a text message to Kristi Calvert saying that she had "meant to send [an earlier] email but we was so busy" that she had failed to do so.[64]   Nance then added that she would "be a little late to work" on the following Thursday, December 21, 2017, because she had a doctor's appointment at 9:45 a.m.[65]   Calvert replied that:   "We usually need more notice but I'll adjust your schedule to 11 if you think that'll give you enough time."[66]   On Thursday morning, however, Nance sent another text message to Calvert stating that she likely would be later than 11 a.m., because "it's just the holidays," and the doctor's office was "swamped."[67]   Calvert responded that,

---

[61] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 11; *see also* doc. no. 25-1 (Plaintiff's Deposition), at 145-46.  Nance later said that her "stomach actually had been upset all day, morning." *Id.* at 146.

[62] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 11 (alterations and emphasis supplied).  *See also* doc. no. 25-1 (Plaintiff's Deposition), at 146-47 (where Nance says that she was attempting to express her impression that Heidi Brown possessed an "unpleasant facial expression":  one that conveyed a visual "I-don't-want-to-talk-to-you" message).

[63] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 11.

[64] Doc. no. 29-7 (Plaintiff's Exhibit 7), at 5.

[65] *Id.*

[66] *Id.*  Nance replied "Yes sorry I so forgot after being busy and thanks so much."  *Id.*

[67] *Id.* at 7 (alteration supplied).

if Nance did not report to work by 11:00 a.m., it would have to be recorded as "a tardy," but she added this apology: "Sorry we can't make adjustments to the schedule last minute. We have to follow policies."[68]  Plaintiff replied "No worries"[69] — most likely because she knew the appointment would be covered by her previously-approved intermittent FMLA leave: a fact of which Calvert had no knowledge.[70]

The following day (Friday, December 22, 2017), Heidi Brown delivered Nance's one-to-three month "Provisional Performance Appraisal," which recorded that Nance needed to improve her conduct in four of the seven behavioral areas on which Registration Unit employees were graded.[71]  Brown also noted that

> Hospital staff and co-workers perceive Tiara [as] being negative.  Tiara has made several negative comments about the job and not wanting to be at work.  She has tried to engage in several negative conversations with co-workers.  Co-workers stated they've had a hard time working with Tiara do [sic] to the failed Standards of Behavior listed above.

Doc. no. 25-18 (Provisional Performance Appraisal), at 2 (alteration supplied). Despite those stated concerns, Brown noted that Nance met all job performance

---

[68] *Id.*

[69] *Id*.

[70] *See* doc. no. 25-15 (Kristi Calvert Affidavit), ¶ 11 (testifying that she was neither "involved in approving employees to take FMLA leave," nor aware of whether Nance "had applied for or was using FMLA leave to cover any of her absences"). *See also id*. ¶ 12 (testifying that Calvert "did not hear anyone say anything about Ms. Nance being disabled or having Crohn's disease").

[71] The Standards of Behavior specified as "**Needs Improvement**" were: "Performance is reflected in a friendly and respectful attitude"; "Communication with patients, customers, and co-workers is vital"; "Commitment to co-workers"; and "Pride and ownership in your job and the organization."  Doc. no. 25-18 (Provisional Performance Appraisal), at 2.

expectations.[72]  Brown also continued Nance's provisional employment, but not

without adding the following warnings:

> **Strengths**:  Tiara has adapted really well to the registration functions
> which has allowed her to work in our GMT Surgery area.
>
> **Areas for Improvement**:  *Tiara needs to drastically improve the*
> *Standards of Behavior which were marked* "needs improvement" *in*
> *section two listed above*.[73]
>
> **Goals**:  *Tiara should strive to refrain from any negative conversations*
> *or comments*.  Tiara needs to follow Huntsville Hospital Standards of
> behavior at all times.
>
> **Manager Comments**:
> I am continuing Tiara's provisional period to give her time to show great
> improvement with all areas listed above.  *Any further negative behavior,*
> *comments or not adhering to Huntsville Hospital Standards of Behavior*
> *will result in termination*.

*Id*. at 3 (boldface in original, *italicized* emphasis supplied).

Nance admitted her receipt and understanding of Brown's performance

appraisal, and presciently acknowledged her understanding of the following

statements by placing a check-mark next to each:

> [✓] I have read my performance review and job description and am
> qualified to perform the functions listed with or without
> accommodations.
>
> [✓] I understand that I am not eligible to transfer to another position

---

[72] *Id.*

[73] See note 71, *supra*.

within HH Health System until I have satisfactorily completed one year of service in my current position or I have obtained my manager's permission.

*Id*. at 4.

Eight days later, on Saturday, December 30, 2017, Nance transmitted a text message to Heidi Brown stating: "I just wanted to let you know I appreciate all that you do and that's for being a Real understanding boss 100!!!  Have a Happy New Year."[74]  Nance testified that, on the date of transmitting that message, she believed Brown was "a Real understanding boss."[75]

Five days after that, *i.e.*, on Thursday, January 4, 2018, Nance sent an email message to Brown asking about the status of another person's job application, and adding this compliment:  "I also told her [the applicant] that you was [*sic*] very professional and outstanding boss that goes above and beyond!"[76]

Brown, however, continued to hear complaints about Nance from other employees in the Registration Unit.  Registrar Kelsey Kemp and Brianna Cave each told Brown that Nance "often complained that she did not want to come to work."[77]

---

[74] Doc. no. 25-19 (Communication Between Nance and Brown), at 3; doc. no. 25-14 (Heidi Brown Affidavit), ¶ 22.

[75] *See* doc. no. 25-1 (Plaintiff's Deposition), at 152-53.

[76] Doc. no. 25-19 (Communication Between Nance and Brown), at 2; doc. no. 25-14 (Heidi Brown Affidavit), ¶ 22.  *See also* doc. no. 25-1 (Plaintiff's Deposition), at 154-56.

[77] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 12.

Kim Carroll told Brown that Nance "was always talking negative[ly] about the job, her co-workers and her leadership team and she couldn't listen to it anymore."[78]

During the same time period of early January 2018, Nance experienced more flare-ups of her Crohn's disease. She transmitted text messages to Kristi Calvert on Wednesday, January 3, and again on the following Monday, January 8, 2018, stating that she could not work on those days.[79]

Three days later, *i.e.*, on Thursday, January 11, 2018, Jennifer Garner-Haynes (Nance's Registration Unit Team Leader) reported to Brown that she had asked Nance and Kim Carroll to go to another floor of the Hospital, and to there obtain the signatures on admission forms of some patients who had been directly admitted to a Hospital unit.[80] Garner-Haynes said that, in response, Nance "rolled her eyes and stated that she didn't want to go."[81] "Instead," she "sat in the office complaining and talking negatively about leadership and having to get signatures."[82] Garner-Haynes

---

[78] *Id.* ¶ 13 (alterations added).

[79] *See* doc. no. 29-7 (Text Messages between Nance and Calvert), at 8 (Jan. 3, 2018 message stating, "Morning I [won't] be able to make it to work I'm very sick") (alteration supplied); *id.* (Jan. 8, 2018 message stating, "I'm not sure if I will make it tomorrow [at] 5am or [at] all I'm sick"). *See also* doc. no. 25-1 (Plaintiff's Deposition), at 131-35.

[80] *See* doc. no. 25-1 (Plaintiff's Deposition), at 158-61.

[81] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 15.

[82] Doc. no. 25-17 (Jennifer Garner-Haynes Affidavit), ¶ 7 (alteration added); *see also id.* ¶ 5 ("I complained to Heidi Brown that I learned Nance had been talking negatively about her bosses to another coworker."). Nance disputed the description of events reported in the text accompanying this footnote, and states that she obtained the signatures, and that it actually was Kim Carroll who complained and gossiped about Heidi Brown and Jennifer Garner-Haynes. *See* doc. no. 25-1

also reported that Nance "was not always friendly with patients."[83]

As a result of the increasing number of negative reports about Nance's behavior, Heidi Brown conferred with Kristi Calvert, the Main Admitting Unit Coordinator, on Thursday, January 11, 2018, and they jointly concluded that Nance "was not a fit with our department and [they] decided to fail her provisional period."[84]

Brown met with Nance later that same day, and offered her "the opportunity to resign her employment in lieu of termination, to make it easier for her to find another position within the hospital."[85]

Nance says that Brown remarked during their termination meeting that her "body language" indicated the Registration Unit position was too stressful "on [Nance's] body," and was hindering her performance.[86]  Brown denied that, saying

---

(Plaintiff's Deposition), at 158-61.  Nance also specifically denied that *she* refused to obtain patient signatures, but admits that Garner-Haynes lodged that claim with Brown.  *Id*. at 161.

[83] Doc.  no. 25-17 (Jennifer Garner-Haynes Affidavit), ¶ 6.

[84] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 15 (alteration supplied).  *See also* doc. no. 25-15 (Kristi Calvert Affidavit), ¶ 10.

[85] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 16; *see also* doc. no. 25-1 (Plaintiff's Deposition), at 162 (where Nance incoherently states that Brown "told me she didn't want to terminate me because I had been there for quite a long time and she didn't want me to, you know, lose my ETO [*presumably*, "Earned Time Off"] or something like in three months provision, like you could still find a job within the hospital.  But I would have to go to HR and they would have to help me") (alteration added).

[86] *See* doc. no. 25-1 (Plaintiff's Deposition), at 162-63 ("She told me my body language, had somebody watching me and said she felt like that the job was too much stressful on my body and it was hindering me from doing my job."); *id.* at 165-66 ("Q.  And that's what she said, too much stress on your body?  A.  Yes."); *id.* at 166-67 (Nance admits the job was stressful, but denies that she had expressed that fact to co-workers).

that Nance had told several co-employees that "she did not want to work in registration," and she consequently told Nance "the position might be too much pressure because representatives have to contend with the constant stress of high patient volume."[87]   Brown insisted that, "[a]t no point during the meeting did I indicate I thought Ms. Nance could not perform her job on the basis of any purported disability or illness."[88]

Indeed, Nance admitted that, prior to the January 11, 2018 meeting during which Brown offered her the opportunity to resign, to avoid termination, neither Kristi Calvert nor Heidi Brown had made any negative remark to her about taking time off work for treatment of the manifestations of her Crohn's disease.[89]   Even so, Nance inexplicably construed Brown's one-word text-response to one of Nance's requests for time off (*i.e.*, "Okay") as conveying a negative attitude.[90]

_____

[87] Doc. no. 25-14 (Heidi Brown Affidavit), ¶ 18 (alteration supplied).

[88] *Id.* ¶ 17 (alteration supplied).

[89] *See* doc. no. 25-1 (Plaintiff's Deposition), at 111 (lines 7-13) ("Q.  Well, I mean, did Christy [*sic*: Kristi Calvert] ever make any negative remarks to you about taking time off work?  A. No.  Q. Did Heidi [Brown] ever make any negative comments to you about taking off from work?  A.  No. * * *") (alterations and ellipsis supplied).

[90] *See id.* at 111-12, where the following testimony is recorded:

     Q.  Did Heidi [Brown] ever make any negative comments to you about taking time off work?

     A.  No.  There was an incident, but I don't remember.  It might be — it's just the way she interpret — you know, like it was an issue when I stated — you know, stated I was sick one day.

Nance accepted the opportunity to resign her employment,[91] and the "Personnel Action Request – Resignation/Termination" form handed to her by Heidi Brown stated, in the first section (headed "RESIGNATION – EMPLOYEE to complete") that her reason for leaving was: "**x** Other: reason:  Resign in Lieu of Termination."[92]

The second section of that same form, executed by Heidi Brown, stated:  that Nance had "**x** Resigned in lieu of termination"; that she was "**x** Eligible for rehire"; and, that she also was "**x** Eligible for ETO."[93]

After executing the foregoing form and leaving Brown's office, Nance walked to the Hospital's Human Resources Department and filed a form requesting an "Intervention."  In the portion labeled "Nature of Complaint," Nance wrote that, on January 11, 2018, she had been "scheduled to work at Main Admitting from 5

---

Q.  Okay.  And what did she say that you're thinking of in response to that?

A.  It was just basically like okay, you know.  Like, *okay can be either way.  You know, as in okay, that's fine or okay, that's just like whatever.*

Q.  Okay.  And you took her okay to mean okay, whatever?

A.  No, I didn't say that.  I'm just stating it seemed like it was an issue if I didn't come, so I came.

*Id.* (alteration and emphasis supplied).  Nance admitted she likely was sensitive to the brief, one-word retort because, a week or so after beginning to work in registration, co-employee Kim Carroll had told her that "they" (the ubiquitous indefinite pronoun) did not "like you to call out" and, consequently, she should "watch [her] back."  *Id.* at 112-13.

[91] *See* doc. no. 25-20 (Jan. 11, 2018 Personnel Action Request).

[92] Doc. no. 29-2 (Initial Jan. 11, 2018 Personnel Action Request), at 2.

[93] *Id.*

am-1:30 pm and normal work hours for today's date. I worked just half of my shift

[at] Main and done [*sic*] everything that I was told to do upon other's [*sic*] and I went

to <u>GMT</u> building."[94]  She than attached an additional, handwritten page stating that

her desired remedy was to be allowed to transfer to another Hospital unit, rather than

forced to resign:  *i.e.*,

> Requested Remedy                                        01/11/18
> I believe the final remedy should be, *I should be able to transfer out*. I believe I've exceeded expectation in this current position; and also in previous ones held within Huntsville Hospital. I've received many thanks and appreciation by patients themselves. I received a 5 star recognition in the lab department, which is the highest recognition you can get and your picture is posted within the lab. I believe I've been highly professional and positive with patients, as they've stated much [*sic*]. With all these previously stated examples, I believe it spoken in [*sic*] itself that *I should be giving* [*sic*] a *chance to transfer out* and continue being the polite, professional, and hard working employee I am. I thank you for your consideration in listening to my remedy, even if it is to be coached [*sic*].

Doc. no. 29-5 (Request for Human Resources Department Intervention), at 3

(emphasis supplied).

During her deposition, Nance identified another, much-longer, handwritten

statement about the events that occurred in Heidi Brown's office on January 11, 2018,

which — she insisted — had been filed together with the documents described

---

[94] Doc. no. 29-5 (Request for Human Resources Department Intervention), at 2.

above.[95]   The longer, rambling, bordering-upon-incoherent statement reads as

follows:

> On January 11, 2018 I was schedule[d] to work at Main
> Admitting, I had worked there since the beginning of the week when
> Heidi came to the original [department] where I was working which was
> GMT Surgery on Monday 01/08/18 and asked me could I work [at]
> Main, because she was short staff[ed] due to <u>flu</u>, so I told her I didn't
> mine [*sic*] helping out and she asked if I could do 40 [hours] this week,
> I arranged for her so she could have coverage.  I had came [*sic*] to work
> all throughout the week and done my job assignments, then Thursday
> 01/11/18 approached I worked my schedule[d] hours which was [*sic*] <u>5
> am</u> – 1:30 pm, which my normal hours would [have] been <u>10 am</u> – 3 pm,
> everything had been going smooth [*sic*] until Heidi came in for work and
> her Rep III, which is her good friend Jennifer and she begin to act
> different and out of odd [*sic*] Heidi started to help Jennifer out up front
> at the front desk, so Jennifer had come to me and asked me to go get
> <u>signatures</u> which I did, I told her that it would be one minute so I could
> grab the property [*sic*] supplies, ask [*sic*] I was getting the items I had to
> go to the bathroom, so I proceeded to go to the restroom, because I have
> <u>Crohn's</u>.

> So I came back in got my supplies & paperwork for the
> <u>signatures</u>, I left and went and done what I was suppose[d] to do.  I came
> back in updated my information and continue[d] to work.  Then I came
> out the office and Heidi was telling us about the weather policy and
> asked me if I had my cell phone enable[d] for weather alert through the
> hospital so she helped me set up all my information and gave me a
> verification form to be filled out, after all she knew we was [*sic*] short
> of staff and asked me could I relieve the girl that worked <u>GMT</u> building
> and also MRI, which he chose not to take a lunch which she approved
> since we was short so I didn't have to give or relieve his lunch, I went
> in relieved GMT as I left from GMT I was walking back which another
> employee was coming to get me, as I got back to Main I went to get a
> drink in the break room *and the next thing I knew or look up Heidi came*

[95] *See* doc. no. 25-1 (Plaintiff's Deposition), at 173-75.

28

*to the door and said she needed me in her office, so we walked to her office and she started on saying you know I have had someone investigating your body language today and also I heard or someone seen you round your things up & roll your eyes at Jennifer when she asked you to go get signatures and I told her I didn't do anything . . .* [the remaining part of the copy of this page of the handwritten document that was filed is cut off at the bottom] *. . . your saying this definitely* <u>PRE-ASSUMPTION</u> *and how are you gone act off of what someone came in [sic] told you, and not from what you knew. She said you act like [you're] not happy and your body seemed overwhelming and stated she could tell (Heidi). She said she knew my illness and know it can be very stressed or stressful on my body. I feel like if she knew it was stress on body **or she could tell my illness was affecting my job duties**, then why as a manager would she ask me to work extra hours or coach me and assist me on bettering my job and be able to perform and exceed expectations. I feel like my illness hasn't hindered my abilities or skills. **I'm covered under FMLA and I feel like I have been discriminated due to my illness.** She stated that I was eligible for rehire and said it was nothing personal, but I feel like it was more and the whole conversation was base off* <u>PRE-ASSUMPTION</u>*. I feel like overall it should be looked throughout [sic].*

Doc. no. 29-6 (Continued Request for Human Resources Department Intervention), at 2-4 (<u>underlined</u> and ALL CAP emphasis in original, *italicized* and **boldface** emphasis supplied).

The rub for the Hospital lies in the fact that, when Nance's January 11, 2018 "Personnel Action Request – Resignation/Termination" form was stamped as "ENTERED" in the Hospital's records on "JAN 12 2018," the day following the events described above, it included additional information that was not on the copy of the document given to Nance at the conclusion of her termination meeting with

Heidi Brown:  *that is*, *the Hospital's copy stated that Nance had*  "✓ Failed [her]

provisional period."[96]

That additional statement of a reason for Nance's departure was placed on the

Hospital's copy by Cynthia Traylor, an Employee Relations Specialist.  Ms. Traylor's

Affidavit explained her reasons for doing so, as follows:

> 7.     When a hospital employee starts a new position, they are
> placed in a one (1) to six (6) month provisional period, depending on
> performance issues, so that managers can determine if the employee is
> fulfilling the expectations of the position and is a good fit.
>
> 8.     If an employee fails a provision[al] period that failure is
> noted on their electronic human resource record.   That record is
> accessible by human resources employees and recruiters.
>
> 9.     After I learned that Nance failed her provisional period, I
> immediately made a notation on her electronic record that she had failed
> due to poor customer service skills.

Doc. no. 25-13 (Cynthia Traylor Affidavit), ¶¶ 7-9 (emphasis and alteration supplied).

The  specific  notation  that  Traylor  made  on  Nance's  electronic  record  on

January 12, 2018, the day after Nance filed her "Request for Intervention," read as

follows:  "Confidential – Failed Provisional Period due to lack of customer service

skills in Registration.  See Heidi Brown for a reference prior to rehire."[97]

Nance testified that she had not been told that she failed her provisional period

---

[96] Doc. no. 25-20 (Jan. 11, 2018 Personnel Action Request) (alteration supplied).

[97] Doc. no. 25-21 (Nance Electronic Human Resources Record), at 2.

until she spoke to Cynthia Traylor.[98]  Traylor confirmed that:  "After Nance resigned, she came to me and said Brown was 'out to get [her]' but Nance did not mention any discrimination," and Traylor "referred Nance to a recruiter who could help her find a new position in the hospital."[99]

Nance filed a Charge of Discrimination with the EEOC on March 21, 2018, and alleged that Heidi Brown had forced her to resign because of her "illness."[100] Specifically, she charged that

> on 1/11/18, Heidi asked me to come to her office.  Heidi told me that she had someone "investigating my body language" and that someone had seem [*sic*] me roll my eyes at Jennifer, a co-worker, when she asked me to do something.  Heidi said I did not act like I was happy, *and that she knew my illness could be very stressful on my body and that she could tell my illness was affecting my performance of my job duties*.  I responded, asking her why she would ask me to work extra hours  for her if she thought my illness was affecting my ability to perform my job. I told her I didn't think my illness hindered my abilities or skills to do my job.  *I told her I felt that she was being discriminatory because of my illness*.  Other employees have violated work rules, such as smoking e-cigarettes in the building and shopping on the internet on hospital time and equipment.  [*Emphasis* supplied.]

> She said she could either terminate me, or I could resign and be eligible for rehire.  She said that Human Resources would help me find another job within the hospital.  She presented me with a *Personnel Action Request* form, which was marked "x other:  reason:  **Resign in Lieu of Termination**."  At no time did I voluntarily resign; Heidi forced

---

[98] *See* doc. no. 25-1 (Plaintiff's Deposition), at 176-77.

[99] Doc. no. 25-13 (Cynthia Traylor Affidavit), ¶ 10 (alteration in original).

[100] *See* doc. no. 1-1 (EEOC Charge), at 1-2.

me to resign.  Attached is a copy of the *Personnel Action Request - Resignation/Terminatio*n.  [All emphasis in original.]

I contacted Human Resources immediately and complained about Heidi's discriminatory comments and my forced resignation.  I spoke with Cynthia Traylor at my exit interview and told her that I was being discriminated against.  Her response was that she wasn't being judgmental, and that she couldn't take sides.  She essentially ignored my complaint of discrimination.

I have been trying to find another job within the hospital since that date, but have been unsuccessful.  Human Resources has been doing very little to assist me, which I believe is either because of my illness and/or in retaliation for complaining of discrimination.  Only one person in Human Resources has been somewhat helpful, Aqua Wherry, and she no longer works there.  I send out resumes to job openings and I receive no response.  (See attached screen photos of jobs I have applied for.)

Upon information and belief, employees without a disability and/or perceived disability were treated better than I was.  For instance, non-disabled employees are permitted to smoke e-cigarettes or shop on the inernet without repercussion, while I was forced to resign for allegedly rolling my eyes at someone.  Heidi permits a co-worker, Matthew, to not take lunch and get paid for that ½ hour, but when she required me to work through my lunch, I was not paid.

Upon information and belief, I have been discriminated against because of my disability and/or perceived disability, and have been treated disparately, including harassment, hostile working environment, failure to accommodate, and constructive discharge, in violation of the Americans with Disabilities Act . . . .  I complained of the discrimination, but nothing was done in response to my complaint.  *I have been retaliated against*, either because of my disability and/or in retaliation *for complaining of discrimination*.  [Citations omitted, *emphasis* supplied.]

Doc. no. 1-1 (March 21, 2018 EEOC Charge), at 1-2 (bracketed information added

to the ends of the first, second, and last paragraphs).[101]

Nance was interviewed for a position in the Hospital's Lung Center by Robin Barksdale, the Center's Registered Nurse Administrator, on April 23, 2018.[102] Nance was allowed to "shadow" a Lung Center employee the following day,[103] and Barksdale emailed Nance the following job offer on April 27th:

> I would like to offer you a position with our team.  Like I said in the interview I need someone at the front desk but may play musical chairs over time.  I would like to offer you the front office position and with time we will cross train you for other positions to include the back.  After you have some experience in the back you can take the certification test for CCMA.  I will have HR give you a call with an offer.  Fannie will be the contact person.  She is out of the office today so it will be next week before you get a call.  I hope you have a great weekend and we look forward to working with you.

Doc. no. 29-3 (Emails Between Barksdale and Nance), at 2.

Three minutes after transmitting that job offer to Nance (*i.e.*, at 8:52 a.m. on April 27, 2018), Barksdale sent an email to Hospital Recruiter Fannie Proctor, and asked that she extend an official offer of employment to Nance.

> I believe that Misty passed me a resume for Tiara Nance.  I have interviewed her and she came to shadow the front desk yesterday.  We believe she would be a good fit also since the other did not work out.  Could you pull her and make an offer.  My plans for her are to start her

---

[101] **Note**:  Nance verified the Charge on March 21, 2018, but the EEOC stamped it "Received" on March 28, 2018.

[102] *See* doc. no. 1-1 (EEOC Charge), at 5.

[103] *Id*.; *see also* doc. no. 25-22 (Robin Barksdale Affidavit), ¶ 4.

out at the front desk since that is what I need at the moment more than anything. I will cross train her for scheduling and back MA. So at some point her role may change but I will keep you in the loop. Thanks for everything!!

Doc. no. 25-23 (Emails Between Barksdale and Proctor), at 3.

Fannie Proctor reviewed Nance's human resources file, and responded to Robin

Barksdale later that same day, saying:

I looked at Tiara's file and noticed she was let go in her provisional period back in January. The HR record shown below has comments from her previous manager. I have not called to make the offer because I wanted you to be aware. Do you want to reach out to Heidi in registration? I know you said you were putting her at your front desk and it may not be a bad idea to talk to Heidi. Let me know your thoughts.

*Id*. at 2. Barksdale's response to Proctor was as expressive as it was terse: "oh

NO!!!! ok let me put a hold on this for now. thank you for catching that." *Id*. (all

caps and omission of initial capitals in original). Barksdale immediately transmitted

an email to Nance, saying:

I wanted to touch base with you and let you know of a new development in my hiring process. Due to unforeseen circumstances I am going to have to put a hold on making you an offer next week. I am hoping to be able to do it soon, so please be patient with us. I will let you know ASAP.

Doc. no. 29-3 (Emails Between Barksdale and Nance), at 3.

Nearly two months later, on Thursday, June 14, 2018, Nance sent an email to

Barksdale, asking about the status of her job offer:

> I hope all has been well and I no [*sic*] it's been over a month or longer since the last update, I know your [*sic*] a busy lady so I didn't want to bother you so much, but I wanted to check the status of my job offer and see how long will it be or how long will it take for your process to be completed?  I'm very interested and still looking forward to coming apart [*sic*] of the team, that's why I'm reaching out to check the status.  I look forward hearing from you soon and I hope you have a good day!!!

*Id*. at 4.  Barksdale's reply stated that:  "All positions have been filled at the current time.  I will hold on to your resume for upcoming positions."  *Id*.

Barksdale testified that she "did not speak to Cynthia Traylor or Heidi Brown about Nance's job offer," and that she "was not aware that Nance had filed an EEOC Charge at the time or had allegedly made any complaints of discrimination when I decided not to offer her the position."[104]  Nance also did not tell Barksdale that she had filed an EEOC Charge,[105] and she has no evidence of a conversation by either Heidi Brown or Cynthia Traylor with Robin Barksdale about her potential employment in the Hospital's Lung Center.[106]  Moreover, Nance affirmed that she does not contend that Barksdale discriminated against her based upon a disability,

---

[104] Doc. no. 25-22 (Robin Barksdale Affidavit), ¶¶ 8-9.  *See also* doc. no. 25-14 (Heidi Brown Affidavit) ¶ 21 ("I have not had any involvement in Nance being hired by a different department."); *id*. ¶ 24 ("I was not aware that Robin Barksdale was considering hiring Nance for a position and did not have any discussions with her about Nance.").

[105] *See* doc. no. 25-1 (Plaintiff's Deposition), at 178 ("Q.  Did you ever tell Ms. Barksdale that you had filed an EEOC charge?  A.  No.").

[106] *Id*. at 178-80.

because "Ms. Barksdale was not aware of anything."[107]

Heidi Brown and Cynthia Traylor also testified that they had no knowledge of Robin Barksdale's job offer to Nance, and neither discouraged Barksdale from hiring her.[108]

Nance amended her EEOC Charge on May 14, 2018, and alleged that Barksdale had rescinded her job offer in retaliation for her original EEOC charge.

> On April 19, 2018, after applying for a position with the Huntsville Hospital Lung Center, the nurse administrator contacted me to set up an appointment. The interview was conducted on April 23, 2018. I was asked to shadow an employee on Thursday, April 24, 2018. The nurse administrator officially offered me the position on Friday, April 27, 2018, to begin the following week. I was told I would be cross trained for other positions. Later that day, I received an email from the nurse administrator "placing a hold" on her offer of employment. To date, the offer of employment has not been reinstated. (See emails attached evidencing the above facts.)

> Upon information and belief, *the job offer was withdrawn in retaliation for filing a charge of discrimination with the EEOC*, in violation of the Americans with Disabilities Act . . . . I have been retaliated against, either because of my disability and/or in retaliation for complaining of discrimination.

---

[107] *Id*. at 193.

[108] *See* doc. no. 25-14 (Heidi Brown Affidavit), ¶ 24 ("I was not aware that Robin Barksdale was considering hiring Nance for a position and did not have any discussions with her about Nance."); doc. no. 25-13 (Cynthia Traylor Affidavit), ¶ 11 ("Nance must interview with the individual managers supervising the position for which she applies. I have not had any involvement with Nance being hired by a different department, and I have not discourage any other department from hiring Nance."); *id*. ¶ 12 ("I did not communicate with Robin Barksdale about Nance when she was considering Nance for a position at the Lung Center. I did not have any input into Barksdale's decision to withdraw the job offer to Nance.").

Doc. no. 1-1 (May 14, 2018 Amended EEOC Charge), at 5 (emphasis supplied, citations omitted).[109]  The EEOC dismissed the charge, with notice of Nance's right to sue, on November 29, 2018.[110]  This suit followed.

## III.  DISCUSSION

### A.  Discrimination Under the Americans with Disabilities Act

Count One of Nance's complaint is based upon the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA").  To recover, Nance must prove that the Hospital intentionally discriminated against her because of a disability.  "In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases."  *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *see also, e.g.*, *Hilburn v. Murata Electronics N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims.") (citing *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)).

In order to establish a *prima facie* case of disability discrimination, a plaintiff

---

[109] Nance verified her Amended EEOC Charge on May 14, 2018, but the EEOC stamped it as "Received" on May 18, 2018.

[110] *See* doc. no. 1-2 (EEOC Dismissal and Notice of Rights).

must show: (1) that she has a "disability" within the meaning of the ADA; (2) that she is a "qualified individual with a disability," meaning that she can perform the essential duties of the employment position she held or sought, with or without reasonable accommodation being made by the employer;[111] and (3) she suffered an adverse employment action because of her disability. *See, e.g., Lewis v. City of Union City, Georgia*, 934 F.3d 1169, 1179 (11th Cir. 2019).[112]

If a plaintiff establishes all elements of a *prima facie* case, the burden then shifts to the employer "to come forward with legitimate non-discriminatory reasons for its actions . . . ." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993)). "The plaintiff then must demonstrate that [she] will be able to establish at trial that the non-discriminatory reasons proffered by the employer are

---

[111] *See* 42 U.S.C. § 12111(8) (defining a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position.").

[112] Other Eleventh Circuit opinions to the same effect include, *e.g., Mazzeo v. Color Resolutions International, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014); *Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255-56 (11th Cir. 2007); *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445, 1454 (11th Cir. 1998); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).

merely a pretextual ruse designed to mask [the discrimination]." *Id.* (citing *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996)).

## 1.   **First prima facie element**: *does the plaintiff have a "disability"?*

The ADA defines the concept of a "disability" three ways — that is, as including any person:   (A) who has "a physical or mental impairment that substantially limits one or more [of the] major life activities" of such person; or (B) who has a "record of" such an impairment; or (C) who is "regarded as" having such an impairment.   42 U.S.C. § 12102(1) (alteration supplied); *see also* 29 C.F.R. § 1630.2(g).   "An individual is deemed to be 'disabled' for purposes of the ADA if he [or she] satisfies any one of these three enumerated definitions."   *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996) (alteration supplied).

Nance asserts that she suffers from a physical impairment that "substantially limits" one or more of her "major life activities," *see* 42 U.S.C. § 12102(1)(A),[113] *or*

_____

[113] The phrase "substantially limits" is not defined by the Act, but implementing regulations state that the term "shall be construed broadly in favor of expansive coverage."   29 C.F.R. § 1630.2(j)(1)(i).   The regulations further state:

> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.   An impairment need not prevent, or significantly restrict, the individual from performing a major life activity in order to be considered substantially limiting.   Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii).   The EEOC further instructs that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their

*alternatively*, that she was "regarded as" having such an impairment by her Hospital supervisors.[114]  *See id*. § 12102(1)(C).

### a.    "Substantially limits one or more major life activities"

The term "major life activities" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).[115]  A "major life activity" can also include "the operation of a major bodily function," like digestive or bowel functions.  *See* 42 U.S.C. § 12102(2)(B).[116]  In this case, Nance asserts that when she is experiencing a flare-up of her Crohn's disease, she is substantially limited in her ability to care for herself, to eat, and to work.[117]

---

obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity."  29 C.F.R. § 1630.2(j)(1)(iii).

[114] *See* doc. no. 1 (Complaint), ¶ 31.  Nance also alleges in the complaint that she had a record of disability, but does not address that element in any briefing.

[115] *See also* 29 C.F.R. § 1630.2(i)(1)(i) ("Major life activities include, but are not limited to: (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working.").

[116] *See also* 29 C.F.R. § 1630.2(i)(1)(ii) ("Major life activities include, but are not limited to: . . . (ii) The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and *digestive*, genitourinary, *bowel*, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions.") (emphasis supplied).

[117] *See* doc. no. 25-1 (Plaintiff's Deposition), at 82; *see also* doc. no. 29-8 (FMLA Medical Leave Certificate), at 5.

There is no dispute that Nance experiences flare-ups of her Crohn's disease. The Hospital, however, questions whether Crohn's disease qualifies as an impairment under the ADA; and, if so, whether the flare-ups impose substantial limitations upon any of Nance's major life activities.

Initially, the Hospital argues that Crohn's disease is not a *per se* disability.[118] *See, e.g.*, *Ezell v. Renal Care Grp., Inc.*, No. 5:17-CV-002-TBR-LLK, 2018 WL 2054562, at *12 (W.D. Ky. May 2, 2018) (granting summary judgment to employer where employee with Crohn's disease and irritable bowel syndrome failed to "explain how her impairments substantially limit her ability to perform a major life activity"); *Wedel v. Petco Animal Supplies Stores, Inc.*, No. 13-CV-2298, 2015 WL 859072, at *4 (D. Kan. Feb. 27, 2015) (holding plaintiff was not substantially limited by Crohn's disease where she was able to return to work after surgery with only minor accommodations).

Neither of the foregoing cases is binding authority, nor does either hold categorically that Crohn's disease does not qualify as an "impairment."  Instead, both opinions simply focus upon the question of whether, in the specific circumstances of each case, the plaintiff had established that one or more of his or her major life activities had been substantially limited by the disease.  If a person who suffers from

---

[118] Doc. no. 24 (Defendant's Brief), at 18.

Crohn's disease or another gastrointestinal disorder is substantially limited in his or her ability to perform one or more major life activities due to the illness, then that person could be considered a person with a qualifying disability. *See Hardy v. Alabama Department of Industrial Relations*, No. 2:11-cv-230-SRW, 2013 WL 1336726, at *8 (M.D. Ala. Mar. 29, 2013) (denying summary judgment where the plaintiff had gastrointestinal issues that substantially limited her ability to work). Therefore, a reasonable jury could find that Nance's Crohn's disease qualifies as "an impairment."

The Hospital alternatively contends that, even if Nance's Crohn's disease qualifies as an impairment, it does not substantially limit her performance of a major life activity.[119] The Hospital argues that Nance's flare-ups did not limit her ability to work, drive, sit, stand, talk, walk, care for her children, bathe herself, or sleep — all examples of major life activities.[120] Nance, however, asserts that, when she has a flare-up, the only thing she can do is rest, and she requires assistance in caring for her children.[121] It even is difficult for her to bathe herself.[122] When she is nauseous or

---

[119] *Id.* at 19.

[120] *Id.*

[121] Doc. no. 29 (Plaintiff's Brief), at 15.  *See also* doc. no. 25-1 (Plaintiff's Deposition), at 83-84.

[122] Doc. no. 25-1 (Plaintiff's Deposition), at 84.

vomiting, she cannot eat: an activity explicitly listed as a major life activity.[123]  Her physician noted that Nance should not work during a flare-up.[124]  Although the evidence demonstrates that it is possible for Nance to work during a Crohn's flare-up, as she had to do before becoming eligible for FMLA leave, it is likely more difficult for her "as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(1)(ii).

The Hospital also contends that Nance's flare-ups are infrequent.[125]  Nance testified that her flare-ups occur every two or three months, and last two to three days at a time.[126]  Congress broadened the coverage of the Americans with Disabilities Act when enacting the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), effective Jan. 1, 2009.  *See* 42 U.S.C. § 12101 note (2008) (Findings and Purposes); *see also* 29 C.F.R. § 1630.1(c)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA."); 29 C.F.R. § 1630.2(j)(1)(i) ("'Substantially limits' is not meant to be a demanding standard.").  The revised regulations specifically state that "[a]n impairment that is episodic or in remission is a disability *if it would*

---

[123] *Id.* at 82.

[124] Doc. no. 29-8 (FMLA Medical Leave Certificate), at 5.

[125] Doc. no. 34 (Defendant's Reply Brief), at 5.

[126] *See* doc. no. 25-1 (Plaintiff's Deposition), at 81-82.

*substantially limit a major life activity when active*." 29 C.F.R. § 1630.2(j)(1)(vii) (emphasis supplied). Thus, the ADAAA revisions make clear that episodic illnesses can qualify as disabilities as long as they substantially limit a major life activity when present. *Id.*

In summary: the flare-ups experienced by Nance when her Crohn's disease is active limit at least one major life activity (eating); episodic conditions are included in the definition of a disability; and Nance has offered evidence on the "severity, frequency, and duration of these episodes." *See Lewis*, 934 F.3d at 1180. Therefore, a genuine issue of material fact exists as to whether Nance has a disability recognized by the ADA.

### b.    "Regarded as"

Nance also contends that the Hospital "regarded" her as having a disability covered by the ADA. Prior to the ADA Amendments Act of 2008, Nance would have been required to show that the Hospital not only regarded her as having an impairment, *but also* that the defendant perceived that impairment as substantially limiting one or more of her major life activities. *See Adkison v. Willis*, 214 F. Supp. 3d 1190, 1196 (N.D. Ala. 2016) (citing *Rossbach v. City of Miami*, 371 F.3d 1354, 1360 (11th Cir. 2004)). Under the current, amended version of the ADA, Nance must only establish that defendant perceived her as having a physical or mental

impairment, regardless of whether the impairment "is perceived to limit a major life activity." *Id.* at 1196-97 (quoting 42 U.S.C. § 12102(3)(A)); *see also Cooper v. CLP Corp.*, No. 2:13-cv-02152-JEO, 2015 WL 9311964, at *4 (N.D. Ala. Dec. 23, 2015) (quoting *Rubano v. Farrell Area Sch. Dist.*, No. 11-1574, 2014 WL 66457, at *11 (W.D. Pa. Jan. 8, 2014) ("After the 2008 amendments to the ADA definition of disability, all that an ADA plaintiff must show to raise a genuine issue of material fact for the 'regarded as' prong is that a supervisor knew of the purported disability.")).

The person considered to be the "employer" for purposes of this prong of the definition is usually the one "who actually made the allegedly discriminatory decision." *Mancini v. City of Providence by & through Lombardi*, 909 F.3d 32, 46 (1st Cir. 2018).  In this case, the employer in question would be Heidi Brown. Therefore, Nance must present substantial evidence that Brown actually perceived Nance to have an impairment as defined under the ADA.

Nance contends that the statements she alleges Brown made about the job being "stressful on her body," and about that stress making it difficult for Nance to perform her work duties, demonstrated that Brown "regarded" Nance as having an impairment.[127]  That comment is the only evidence Nance offers.

The Hospital argues that "the vague comment Nance alleges Brown made about

---

[127] *See* doc. no. 29 (Plaintiff's Brief), at 15-16; *see also* doc. no. 25-1 (Plaintiff's Deposition), at 162-63, 165-66, 187.

the position being stressful on Nance does not amount to direct evidence of discrimination."[128] Defendant also contends that the evidence that Ms. Brown "hired or retained an employee despite knowledge of the impairment demonstrates the [employer] was not biased against the employee and did not view the employee as disabled."[129] *See Cunningham v. Nordisk*, 615 F. App'x 97, 100 (3d Cir. 2015) (finding no evidence defendant regarded plaintiff as disabled where defendant integrated plaintiff back to full-time status, rated her as "Meets Expectations" on her annual performance review, and gave her a raise and bonus); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 215 (4th Cir. 1994) (finding a strong inference that termination was not motivated by bias where employer hired plaintiff despite full knowledge of disability).

Indeed, it is undisputed that Brown hired Nance with full knowledge of her Crohn's disease, and of her need for time off for treatment when experiencing flare ups.[130] Further, Brown noted that the Nance's work often met expectations, and extended her provisional period in order to allow her an additional opportunity to successfully complete her provisional requirements.[131] Brown also never made any

---

[128] Doc. no. 34 (Defendant's Reply Brief), at 7.

[129] Doc. no. 24 (Defendant's Brief), at 20.

[130] *See* doc. no. 25-1 (Plaintiff's Deposition), at 104-05.

[131] *See id.* at 151-52; *see also* doc. no. 25-18 (Provisional Performance Appraisal), at 3.

negative remarks to Nance about taking time off work when she was sick.[132]

There is little evidence that Brown perceived Nance's Crohn's disease to be a disability. However, Brown's knowledge of the disease alone is enough to create a genuine issue of material fact as to whether Brown regarded Nance as disabled. Regardless, the question still remains whether Brown asked Nance to resign (or be fired) *because of* her actual impairment.

### 2. Unlawful Discrimination

It is undisputed that Nance suffered an adverse employment action when she was asked to resign in lieu of termination. *See* 42 U.S.C. § 12112(a). The question is whether Nance was asked to resign *because of* her disability, real or perceived.

The Hospital denies that Nance's Crohn's disease was the "but for" cause of the adverse employment action. "[A] plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him **but for** his actual or perceived disability." *Savage v. Secure First Credit Union*, 107 F. Supp. 3d 1212, 1217 (N.D. Ala. 2015) (quoting *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)) (boldface in original). This standard requires Nance to demonstrate that her qualifying disability was the determinative factor in her termination. *See Andrews v. City of Hartford*, 700 F.

---

[132] *See* doc. no. 25-1 (Plaintiff's Deposition), at 111-12.

App'x 924, 927 (11th Cir. 2017).

The Hospital contends, and Nance acknowledged during her deposition, that she was terminated for failing her provisional period.[133] Once the Hospital articulated a legitimate non-discriminatory reason for terminating Nance, the burden shifted back to Nance to demonstrate that the proffered reason was mere pretext for intentional discrimination.  *See Stewart*, 117 F.3d at 1287; *Chapman*, 229 F.3d at 1030.

Nance cannot prove pretext simply by disagreeing with the defendant's stated reason for termination.  Nance can carry that burden only by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (quoting *Sheridan v. E.I. duPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Nance does not identify any specific evidence in her brief that the Hospital's proffered, legitimate, non-discriminatory reason was actually pretext for discrimination.  She simply asserts, without specificity, that there is "ample evidence" that defendant's proffered reason is pretextual.  Even so, the court can still analyze any evidence offered in support of the *prima facie* case.  *See Combs*, 106 F.3d at 1528

---

[133] *See id.* at 176.

(holding that, in the pretext analysis, the plaintiff must be afforded the opportunity to "come forward with any evidence, *including the previously produced evidence establishing the* prima facie *case*, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.") (citations omitted) (emphasis supplied).

The only evidence of discrimination that Nance offers in the *prima facie* case is Brown's alleged comment about the work being "stressful on Nance's body."[134] That alleged statement is not enough to constitute discrimination, and it certainly is not enough to demonstrate that defendant's proffered legitimate, non-discriminatory reasons for the adverse employment action Nance suffered are pretext for disability discrimination.  The evidence points to Brown and Calvert jointly deciding to ask Nance to resign because of her multiple violations of the Standards of Behavior. Even if Nance's claims that she did not violate those standards are true, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1363 (11th Cir. 1999).  Nance admitted that Brown *was told* that she had "rolled her eyes," and refused to go to another floor of the Hospital to obtain the signatures of patients who had been

---

[134] *See id.* at 162-63, 165-66, 187.

directly admitted to a unit without going through the Registration desk.  Thus, it does not matter that Nance disputes whether her actions were precisely like the events that had been related to Brown.[135]  Additionally, Nance was on notice after her December 22, 2017 "Provisional Performance Appraisal" that "[a]ny further negative behavior, comments or not adhering to Huntsville Hospital Standards of Behavior [would] result in termination."[136]  Accordingly, defendant is entitled to summary judgment on Nance's disability discrimination claim.

## B.    Retaliation Under the Americans with Disabilities Act

Nance did not plead a claim for retaliation under the ADA as a separate count of her complaint.[137]  Instead, she tucked that assertion into her first count:

### COUNT ONE
### DISCRIMINATION UNDER THE ADA, AS AMENDED

30.    Plaintiff, Tiara Nance, re-alleges and incoporates paragraphs 1-29 above as if pleaded separately herein.

31.    During her employment, plaintiff suffered from a disability in that she had a physical impairment that substantially limited one or more of her major life activities, had a record of such impairment, and/or

---

[135] *See id.* at 161.

[136] Doc. no. 25-18 (Provisional Performance Appraisal), at 3 (alterations supplied).  Nance also acknowledged on that form that she was "not eligible to transfer to another position within HH Health System until [she had] satisfactorily completed one year of service in [her] current position or [she had] obtained [her] manager's permission."  *Id.* at 4 (alterations supplied).

[137] Plaintiff's Complaint state only three Claims:  *i.e.*, Count One alleges "Discrimination Under the ADA, as amended"; Count Two states a claim for "Interference in Violation of the FMLA"; and Count Three asserts "Retaliation in Violation of the FMLA."

was regarded as having such impairment.  Defendant discriminated against Tiara Nance in the terms and conditions of her employment based upon her disability and/or perceived disability, including constructive discharge.

32.    Defendant discriminated against Tiara Nance because of her disability and/or perceived disability, *when it prevented and/or refused to rehire her in another position within the Huntsville Hospital system after engaging in federally protected activity*.

Doc. no. 1 (Complaint), at 8 (emphasis supplied).[138]

The Hospital argues that Nance's vague assertion that it "discriminated against" her under the ADA when Robin Barksdale withdrew the offer to hire Nance to a position in the Lung Center after Nance engaged "*in federally protected activity*"[139] is not sufficient to state a separate claim for retaliation.[140]

The specificity of pleadings filed in federal court are governed primarily by Federal Rules of Civil Procedure 8[141] and 10.[142]

---

[138] On the contrary, the ADA retaliation claim is clearly stated in her EEOC Charge of Discrimination.  *See* doc. no. 1-1 (EEOC Charge), at 2 ("I have been retaliated against, either because of my disability and/or in retaliation for complaining of discrimination."); *see also id.* at 5 (same).

[139] Doc. no. 1 (Complaint), ¶ 32 (emphasis supplied).

[140] Doc no. 24 (Defendant's Brief), at 25 n.3 ("Nance did not plead a retaliation claim as a separate court and thus has not stated a claim for retaliation.  *Knabe v. Boury Corp.*, 114 407, 408 [n.1] (3d Cir. 1997) (refusing to address employee's retaliation claim that she failed to plead as a count in her complaint).  Rather, Nance merely references, as part of her [ADA] discrimination claims, that Huntsville Hospital refused to rehire her for 'engaging if [*sic*: in] federally protected activity.'  (Doc. 1 at ¶ 32).  Huntsville Hospital only addresses this claim out of an abundance of caution.") (alterations supplied).

[141] Rule 8(a) states that:

A pleading that states a claim for relief must contain:  (1) a short and plain

51

> The purpose of Rule 8 is to provide a defendant notice of the claim and the facts supporting it. *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 610 (11th Cir. 2008) ("The point [of Rule 8] is to give the defendant fair notice of what the claim is and the grounds upon which it rests."). Rule 10 works in conjunction with Rule 8 by requiring each claim "founded on a separate transaction or occurrence to be stated in separate counts *if needed for clarity*." *Id.* "These rules work together so that [the plaintiff's] adversary can discern what he is claiming and frame a responsive pleading." *Id.*

*Cajun Steamer Ventures, LLC v. Thompson*, 402 F. Supp. 3d 1328, 1336 (N.D. Ala. 2019) (emphasis supplied). While the pleading practices of plaintiff's attorney certainly will not be applauded, the Hospital was on notice that Nance *might be* asserting an ADA retaliation claim, as demonstrated by the fact that the Hospital chose to address such a claim in its brief in support of summary judgment — *albeit*, only "out of an abundance of caution."[143] Therefore, as justice requires,[144] the court

---

statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

[142] Rule 10(b) states that

> A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. *If doing so would promote clarity*, *each claim founded on a separate transaction or occurrence* — and each defense other than a denial — *must be stated in a separate count* or defense. [Emphasis supplied].

[143] Doc no. 24 (Defendant's Brief), at 25 n.3.

[144] *See* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."); *see also id.* 8(d)(1) ("No technical form is required.").

also will address the elements of an ADA retaliation claim.

To establish a *prima facie* retaliation claim under the ADA, a plaintiff must show:  (1) that she engaged, or participated, in statutorily protected expression or activity; (2) that she subsequently suffered an adverse employment action; and (3) that there is a causal linkage between the protected expression or activity and the adverse employment action.[145]  *See Lucas*, 257 F.3d at 1260-61 (citing *Farley v. Nationwide Mutaul Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999)); *Stewart*, 117 F.3d at 1287 (citing *Goldsmith v. City of Atmore*, 96 F.2d 1155, 1163 (11th Cir. 1993) (explaining *prima facie* elements of Title VII retaliation claim)).

To demonstrate a causal linkage, a plaintiff must show "that (1) the decision-makers were aware of the protected conduct and (2) the protected activity and the adverse act were not wholly unrelated."  *Alansari v. Tropic Star Seafood Inc.*, 388 F. App'x 902, 905 (11th Cir. 2010) (citing *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).  "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly

---

[145] Note that Nance does not have to prevail on the underlying ADA discrimination claim in order to establish a *prima facie* retaliation claim.  *Cf. Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989) (holding that a plaintiff "need not prove the underlying claim of discrimination which led her to protest"; rather, "an employee's opposition to discrimination is protected if she could reasonably form a good faith belief that the discrimination in fact existed").  *See also, e.g., Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997) ("An individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA.").

unrelated." *Shannon*, 292 F.3d at 716-17 (quoting *Bass v. Bd. of Cty. Comm'rs, Orange Cty., Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001)).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation." *Stewart*, 117 F.3d at 1287 (citing *Goldsmith*, 996 F.2d at 1163). If the defendant does so, "plaintiff must then demonstrate that [she] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Id.* (citing *Isenbergh*, 97 F.3d at 440).

Here, Nance easily meets the first two elements of the *prima facie* case. She engaged in statutorily protected activity on January 11, 2018, when she filed an internal "Request for Intervention" with the Hospital's Human Resources Department, and on March 21, 2018, when she executed and mailed a Charge of Discrimination to the EEOC. She suffered an adverse employment action on April 27, 2018, when Robin Barksdale withdrew her offer to employ Nance for a position in the Hospital's Lung Center.[146] However, the causal link between those actions is

---

[146] *See* doc. no. 29-3 (Emails Between Barksdale and Nance), at 3 ("Due to unforeseen circumstances I am going to have to put a hold on making you an offer next week."). Barksdale definitively confirmed that Nance would not be offered the position in the Hospital's Lung Center on June 14, 2018, when she transmitted the email stating: "Tiara, All positions have been filled at the current time." *Id.* at 4.

tenuous at best.

Nance admits that she did not tell Robin Barksdale that she had filed an EEOC charge.[147]   Nance also has no evidence to dispute the Hospital's contention that Barksdale did not speak with anyone who possessed knowledge of Nance's EEOC charge: *either on or before April 27, 2018*, when Barksdale sent Nance an email stating that, "[d]ue to unforeseen circumstances," she had to place a hold on extending a job offer;[148] *or on or before June 14, 2018*, when Barksdale informed Nance that the position no longer was available.[149]

However, Nance contends that the "close temporal proximity" between her act of filing a "Request for Intervention" with the Hospital's Human Resources Department on January 11, 2018, and Cynthia Traylor's act of updating Nance's personnel file the following day, to reflect that she had failed her provisional period "due to [her] lack of customer service skills in Registration"[150] is sufficient to create a genuine issue of material fact.[151]  *See Singleton v. Pub. Health Trust of Miami-Dade Cty.*, 725 F. App'x 736, 738 (11th Cir. 2018) ("[W]here a decision-maker becomes

---

[147] *See* doc. no. 25-1 (Plaintiff's Deposition), at 178 ("Q.  Did you ever tell Ms. Barksdale that  you had filed an EEOC charge?  A.  No.").

[148] Doc. no. 29-3 (Emails Between Barksdale and Nance), at 3.

[149] *See* doc. no. 25-1 (Plaintiff's Deposition), at 178-80; *see also* doc. no. 25-22 (Robin Barksdale Affidavit), ¶ 9 ("I was not aware that Nance had filed an EEOC Charge at the time or had allegedly made any complaints of discrimination when I decided not to offer her the position.").

[150] Doc. 25-21 (Nance Electronic Human Resources Record), at 2.

[151] *See* doc. no. 29 (Plaintiff's Brief), at 18.

55

aware of protected conduct, a close temporal proximity between the decision-maker's acquisition of that knowledge and an adverse employment action will generally be enough to create a factual issue on the causation element.").

Specifically, Nance argues that Cynthia Traylor possessed actual knowledge of her protected conduct of filing a "Request for Intervention" with the Hospital's Human Resources Department:[152] the act that, she alleges, motivated Cynthia Traylor to annotate Nance's personnel file with the statement that she had "Failed [her] provisional period,"[153] in order to ensure that she would not be rehired by the Hospital.[154] The statement added to Nance's personnel file by Traylor is apparently

---

[152] If, as Nance alleges in her brief, she handed her "Request for Intervention" directly to Cynthia Traylor when they met on January 11 or 12, 2018 — *see* doc. no. 29 (Plaintiff's Brief), at 17 (citing doc. no. 25-1 (Plaintiff's Deposition), at 167-69, 173-75) — then Traylor would be deemed to possess direct knowledge of Nance's statement that: "*I'm covered under FMLA and I feel like I have been discriminated due to my illness.*" Doc. no. 29-6 (Continued Request for Human Resources Department Intervention), at 4 (emphasis supplied).

**Note well**, however:  Nance testified that she was not sure whether she gave her "Request for Intervention" directly to Cynthia Traylor or Aqua Wherry, another employee in the Human Resources Department.  *See* doc. no. 25-1 (Plaintiff's Deposition), at 167-69.  Either way, the Hospital contends it has no record of the complaint.  *See id.* at 169.

[153] Doc. no. 25-20 (Jan. 11, 2018 Personnel Action Request) (alteration added).

[154] *See* doc. no. 29 (Plaintiff's Brief), at 18.  Traylor also specifically told Nance during their meeting that the fact she had failed her provisional period might make others in the hospital wary of hiring her.

> Q.  All right.  So I mean, do you understand if somebody else in the hospital was going to hire you, if they found out that you had failed your provisional period that that would make them not want to hire you?
>
> A.  Yeah, she told me.  But she also told me that, you know, I'd been there long enough that people can go off their own judge basis.

what led Robin Barksdale to rescind Nance's job offer, plausibly linking Traylor's action to the ultimate adverse employment action.

Another question that needs to be addressed, however, is whether Traylor's annotation of Nance's personnel file, which led to the ultimate "adverse employment action" (*i.e.*, Robin Barksdale's withdrawal of her job offer to Nance), constitutes an "adverse employment action" on its own.

> The ADA prohibits a wide variety of adverse employment actions when the employer takes those actions for a prohibited reason. [*Doe v.*] *Dekalb* [*Cty. Sch. Dist.*], 145 F.3d [1441,] 1447 [11th Cir. 1998]. "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). . . .

*Martin v. Eli Lilly & Co.*, 702 F. App'x 952, 956 (11th Cir. 2017). The Eleventh Circuit in *Gillis v. Georgia Department of Corrections* held that "an evaluation that directly disentitles an employee to a raise of any significance is an adverse employment action." 400 F.3d 883, 888 (11th Cir. 2005). Similarly, a performance record that directly led to Nance's inability to be rehired could constitute an adverse employment action. The close temporal proximity between Nance's act of filing a

---

Doc. no. 25-1 (Plaintiff's Deposition), at 176-77.

"Request for Intervention" with the Hospital's Human Resources Department on January 11, 2018, and Cynthia Traylor's act of updating Nance's personnel file on the following day, to reflect that she had failed her provisional period "due to [her] lack of customer service skills in Registration,"[155] may be sufficient to show that the protected activity and the adverse employment action were not wholly unrelated. Accordingly, the court will presume that Nance has established a *prima facie* case.

Thus, the burden shifts to the Hospital to articulate a legitimate, non-discriminatory reason for the adverse employment action of Barksdale's withdrawal of her offer to employ Nance in the Hospital's Lung Center. The Hospital has done so by consistently stating that Nance was not rehired due to the fact that she had failed her provisional period.[156]

Accordingly, the burden shifts back to Nance, to prove that the Hospital's proffered, allegedly non-discriminatory reason is pretextual. To prove pretext, plaintiff must show "*both* that the reason was false, *and* that the discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). Close temporal proximity between the protected conduct and the adverse employment action may be evidence of pretext, but it is "insufficient to establish pretext by itself."

---

[155] Doc. 25-21 (Nance Electronic Human Resources Record), at 2.

[156] *See, e.g.*, doc. no. 25-22 (Robin Barksdale Affidavit), ¶ 7 ("Because Nance had failed her provisional period in a previous position, I decided not to proceed with Nance's job offer.").

*Hurlbert v. St. Mary's Health Care Systems, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (citing *Wascura*, 257 F.3d at 144-45 (11th Cir. 2001)).  Nance offers no other evidence that the Hospital's consistently stated reason for not rehiring her is mere pretext, and the court sees none.  The Hospital did not demonstrate any behavior that is typically evidence of pretext.  The Hospital never changed its position, consistently stating that Nance was asked to resign in lieu of termination for failing her provisional period in the Registration Unit "due to [a] lack of customer service skills in Registration."[157]  *Cf. Hurlbert*, 439 F.3d at 1298 ("We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext.").  Nance admitted that Cynthia Traylor had forewarned her that the information might lead potential employers within the Hospital to be wary of hiring her.

> Q.  And did you understand [that,] because you were asked to resign during the provisional period[,] that you had failed your provisional period?

> A.  *She made an understanding to me*.

> Q.  Ms. Brown explained that to you?

> A.  No, she just told me, you know, basically that I didn't go through with — *but Ms. Taylor* [*sic*] *broke it down and explained it to me*.

---

[157] *See id.*; and doc. no. 25-21 (Nance Electronic Human Resources Record), at 2 (alteration supplied).

Q.  All right.  So I mean, *do you understand if somebody else in the hospital was going to hire you, if they found out that you had failed your provisional period that that would make them not want to hire you?*

A.  *Yeah, she told me.*  But she also told me that, you know, I'd been there long enough that people can go off their own judge basis [*sic*].

Doc. 25-1 (Plaintiff's Deposition), at 176-77 (alterations and emphasis supplied).

In addition, Cynthia Traylor did not deviate from the Hospital's standard operating procedures when entering the "failed provisional period" notation in Nance's electronic human resource record.[158]  *See Hurlbert*, 439 F.3d at 1299 ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext.").

The legal presumption that hinges on the "close temporal proximity" between Nance's January 11, 2018 "Request for Intervention," and, Traylor's insertion of a notation into her electronic record on the following day, cannot change the fact that all direct evidence uniformly demonstrates that Nance's job offer was withdrawn because she had "[f]ailed [her] Provisional Period due to [a] lack of customer service

---

[158] *See* doc. no. 25-13 (Cynthia Traylor Affidavit), ¶ 8 ("If an employee fails a provision period that failure is noted on their electronic human resources record.  That record is accessible by human resources employees and recruiters."); *id*. ¶ 9 ("After I learned that Nance failed her provisional period, I immediately made a notation on her electronic record that she had failed due to poor customer service skills."); *id*. ¶ 13 ("The electronic human resource record and Nance's other personnel records are kept in the regular course of Huntsville Hospital's business and I certify they are true and correct copies of the originals.").

skills in Registration."[159]  Accordingly, the Hospital's motion for summary judgment on Nance's ADA retaliation claim is due to be granted.

## C.       Family and Medical Leave Act

The remaining counts of Nance's complaint are based upon the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("FMLA").  That Act grants an eligible employee the right to take up to twelve work weeks of unpaid leave each year for any one (or more than one) of several reasons specified in the Act, including "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."   29 U.S.C. § 2612(a)(1)(D) (alteration supplied).  The FMLA creates a private right of action against employers who "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided by the Act.  29 U.S.C. §§ 2615(a)(1), 2617(a); *see also, e.g.*, *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, 724-25 (2003).

The Eleventh Circuit has recognized that 29 U.S.C. § 2615(a) "creates two types of claims:  '*interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and *retaliation claims*, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'"  *Hurlbert*, 439

---

[159] Doc. no. 25-21 (Nance Electronic Human Resources Record), at 2 (alterations supplied).

F.3d at 1293 (quoting *Strickland v. Water Works & Sewer Board of the City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)) (emphasis supplied, internal citations omitted).   Nance has asserted both types of claims:  Count Two alleges a claim for "Interference in Violation of the FMLA"; and, Count Three states a claim for "Retaliation in Violation of the FMLA."[160]

### 1.   Interference

To establish an interference claim, "an employee must demonstrate that [she] was denied a benefit to which [she] was entitled under the FMLA."   *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1267 (11th Cir. 2008) (alterations supplied); *see also* 29 U.S.C. § 2615(a)(1); *Strickland*, 239 F.3d at 1206-07.   Nance need not allege that the employer intended to deny the benefit because the employer's motives are irrelevant to an FMLA interference claim.   *See Hurlbert*, 439 F.3d at 1293.   In this case, Nance was not denied her FMLA benefit before she was asked to resign.   She received the leave to which she was entitled; she had no difficulty in requesting or obtaining approval to take FMLA leave;[161] and she was never refused FMLA leave to cover any of her absences due to illness.[162]

In addition, Nance's acts of taking FMLA leave must be the proximate cause

---

[160] Doc. no. 1 (Complaint), at 9, ¶¶ 33-36.

[161] *See* doc. no. 25-1 (Plaintiff's Deposition), at 76-77.

[162] *Id.* at 198.

of the employer's action that interfered with her FMLA leave:  in this case, asking Nance to resign.  *See Moon v. Kappler, Inc.*, No. 4:13-CV-1992-VEH, 2015 WL 2381061, at *14 (N.D. Ala. May 19, 2015) (citing *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1241-43 (11th Cir. 2010)).  The Hospital can avoid liability by demonstrating that Nance was terminated "for a reason wholly unrelated to the FMLA leave." *Strickland*, 239 F.3d at 1208; *see also Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) ("[T]he right to commence FMLA leave is not absolute, and . . . an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave.") (alteration supplied); *Howard v. U.S. Steel Corp.*, No. 2:11-CV-01010-KOB, 2014 WL 1042968, at *24 (N.D. Ala. Mar. 14, 2014) ("If an employer takes an adverse action that has the effect of preventing an employee from exercising an FMLA right, . . . the employer will not be liable if it is able affirmatively to prove that it took the adverse action for a reason unrelated to FMLA leave.").

In this case, there is no evidence that Heidi Brown asked Nance to resign because she was taking FMLA leave.[163]  There is no evidence that Brown even knew

---

[163] *See* doc. no. 25-1 (Plaintiff's Deposition), at 198 ("Q.  Do you contend that Ms. Brown wanted to terminate you because of using FMLA leave?  A.  I'm not really certain about that.  Q. You don't know?  A.  I can't determine – yeah.  I can't determine her actions.").

Nance received FMLA leave.  Indeed, as discussed earlier in this opinion, despite the fact that Nance informed Brown during her initial interview that she suffered from Crohn's disease,[164] Nance did not tell Heidi Brown that she then was on FMLA leave, and she also acknowledged that Hospital managers, like Ms. Brown, likely did not have access to FMLA records maintained by a third-party insurance company like Mutual of Omaha.[165]  For all of those reasons, defendant is entitled to summary judgment on Nance's FMLA interference claim.

### 2.    Retaliation

In order to establish a claim for retaliation under the FMLA, "an employee must show that [her] employer *intentionally* discriminated against [her] for exercising an FMLA right." *Martin*, 543 F.3d at 1267 (alterations supplied) (emphasis in original); *see also* 29 U.S.C. § 2615(a)(2).  Unlike an interference claim, an employee asserting a retaliation claim "faces the increased burden of showing that [her] employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Strickland*, 239 F.3d at 1207 (citing *King v. Preferred Technical Group*,

---

[164] *See* doc. no. 25-14 (Heidi Brown Affidavit), ¶ 4 ("I knew that Nance had Crohn's disease when I hired her because she volunteered that information in her job interview."); doc. no. 25-1 (Plaintiff's Deposition), at 103-05 (where Nance testified that she also told Ms. Brown during her job interview that she might need time off for intravenous infusions, and the expected dates of such procedures).

[165] *See* doc. no. 25-1 (Plaintiff's Deposition), at 201-03; *see also* doc. no. 25-14 (Heidi Brown Affidavit), ¶ 20 ("I am not involved in approving or granting FMLA leave for employees.  I had no knowledge as to whether Nance was using FMLA leave.").

166 F.3d 887, 891 (7th Cir. 1999)) (alteration supplied, internal quotation marks omitted).

Where, as here, Nance seeks to prove intentional retaliation with circumstantial evidence, the court must analyze the case under the familiar *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Strickland*, 239 F.3d at 1207. Nance bears the initial burden of presenting sufficient evidence to allow a reasonable factfinder to determine that she has satisfied the elements of a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A *prima facie* case of retaliation under the FMLA requires an employee to show: (1) that she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two events. *See, e.g.*, *Smith v. BellSouth Telecommunications, Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001). If Nance satisfies those requirements, the burden shifts to the Hospital to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the Hospital does so, then the burden shifts back to Nance to demonstrate that the Hospital's proffered legitimate, non-retaliatory reasons are actually a mere pretext for retaliation. *McDonnell Douglas Corp.*, 411 U.S. at 802.

Here, the Hospital is entitled to summary judgment because Nance cannot demonstrate a causal linkage between, on the one hand, her exercise of her right to

FMLA leave, and on the other hand, the fact that she was forced to resign in lieu of termination and subsequenty not rehired at the Hospital.

In addition, Nance testified that she was not certain that Brown wanted to fire her because she took FMLA leave.[166]  Moreover, Nance admitted that she never told Heidi Brown or Robin Barksdale about her FMLA leave, and she cannot establish that either of them knew about her FMLA leave.[167]

Even if Nance could establish a *prima facie* case, the Hospital articulated legitimate, non-retaliatory reasons for the contested employment action.  Brown forced Nance to resign in lieu of being terminated, after Brown and Calvert jointly decided that Nance had failed her provisional period,[168] and Barksdale withdrew her job offer when she discovered that Nance had failed her provisional period.[169]  The burden then would shift back to Nance, but the claim still would fail because she cannot prove those legitimate reasons are pretextual if the relevant Hospital personnel did not have knowledge of her FMLA leave.  For these reasons, the Hospital also is entitled to summary judgment on Nance's claim for retaliation under the FMLA.

---

[166] *See* doc. no. 25-1 (Plaintiff's Deposition), at 198.

[167] *See id.* at 199-203.

[168] *See id.* at 176 (where Nance testified that Ms. Traylor explained that she had been asked to resign because she failed her provisional period).

[169] *See* doc. no. 25-22 (Robin Barksdale Affidavit), ¶ 7; doc. no. 25-23 (Emails Between Proctor and Barksdale), at 2.

## IV.  CONCLUSION

For all of the reasons stated herein, the Hospital's motion for summary judgment is due to be granted, and all of Nance's claims dismissed.  A separate Order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this 1st day of June, 2020.

_____
Senior United States District Judge